UNITED STATES of America,
Plaintiff-Appellant,

v.

Harold Dean BUTTS,
Defendant-Appellee.

No. 82–1260.

United States Court of Appeals,
Fifth Circuit.

April 23, 1984.

Sidney Powell, Asst. U.S. Atty., San Antonio, Tex., for plaintiff-appellant.

Gerald Goldstein, Robert B. Hirschhorn, Ralph A. Lopez, San Antonio, Tex., for defendant-appellee.

Before CLARK, Chief Judge, BROWN, GOLDBERG, GEE, RUBIN, REAVLEY, POLITZ, RANDALL, TATE, JOHNSON, WILLIAMS, GARWOOD, JOLLY, HIGGINBOTHAM and DAVIS, Circuit Judges.

CLARK, Chief Judge:

██ Was the monitoring by customs officials of a signal that disclosed the presence of an aircraft in public airspace an unconstitutional search or seizure under the Fourth Amendment because the terms of the warrant authorizing the signaling device required it to be removed before its signal was recorded? We hold it was not. The warrant violation did not change the detection of the defendant's public activity into a Fourth Amendment violation. The evidence obtained by such monitoring should not have been suppressed.

I

On June 19, 1981, a United States Customs Agent filed an affidavit seeking court authorization to install an electronic tracking device, commonly called a beeper, inside a designated aircraft. In the affidavit, the agent alleged that probable cause existed to believe the aircraft would be used to import marijuana into the United States. Based on this affidavit, a United States Magistrate authorized the installation. The warrant required the beeper to be removed within thirty days after its installation. During the night of June 19, a customs agent installed the beeper in the interior of the aircraft, which was parked at a Seguin, Texas, airport.

On July 21, two days after expiration of the thirty-day time limit, a customs agent sought and was granted an extension of the original authorization. No further entry of the aircraft was made at that time. The extension order directed that the beeper be removed no later than August 19, which was thirty days from the date of the original expiration date. The installing agent was not on duty on August 19, and the beeper was not removed as the warrant required.

On August 22, customs officials began monitoring an aircraft emitting signals from a customs beeper. The target aircraft was periodically monitored by radar, sighted and followed by customs pilots, and intercepted when it landed. Customs officials then arrested Butts, the pilot of the target aircraft. Marijuana and other evidence was found on the aircraft.

Butts was charged with importing marijuana into the United States, 21 U.S.C. §§ 960(a)(1), 952(a), with possession of marijuana with intent to distribute it, 21 U.S.C. § 841(a)(1), and with carrying a firearm during the commission of a felony, 18 U.S.C. § 924(c)(2). Before trial, Butts moved to suppress all evidence obtained by customs agents as a result of their monitoring of the beeper on August 22 and 23, the two days on which Butts was piloting the aircraft.[1] The district court granted

---

1. The government did not challenge the district court's conclusion that Butts had standing to contest the installation of the beeper. The physical description of the pilot in the affidavit filed in support of the warrant matched Butts. The

Butts's motion after conducting an evidentiary hearing. The government appealed the district court's order pursuant to 18 U.S.C. § 3731.

A divided panel of this court affirmed the suppression order of the district court. *United States v. Butts,* 710 F.2d 1139 (5th Cir.1983). This holding was vacated by our action granting rehearing en banc. 5th Cir. Local R. 41.3.

## II

In *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), the Supreme Court developed the principles that currently control Fourth Amendment analysis:

> [T]he Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. [Citations omitted.] But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351, 88 S.Ct. at 511. The Court recently summarized these principles:

> Consistently with *Katz,* this Court uniformly has held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a "justifiable," a "reasonable," or a "legitimate expectation of privacy" that has been invaded by government action. [Citations omitted.] This inquiry, as Mr. Justice Harlan aptly noted in his *Katz* concurrence, normally embraces two discrete questions. The first is whether the individual, by his conduct, has "exhibited an actual (subjective) expectation of privacy," 389 U.S., at 361 [88 S.Ct. at 516],—whether, in the words of the *Katz* majority, the individual has shown that "he seeks to preserve [something] as private." *Id.,* at 351 [88 S.Ct. at 511]. The second question is whether the individual's subjective expectation of privacy is "one that society is prepared to recognize as 'reasonable,' " *id.,* at 361 [88 S.Ct. at 516],—whether, in the words of the *Katz* majority, the individual's expectation, viewed objectively, is "justifiable" under the circumstances. *Id.,* at 353 [88 S.Ct. at 512]. [Citations omitted.]

*Smith v. Maryland,* 442 U.S. 735, 740–41, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979) (footnote omitted).

In *United States v. Knotts,* 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), the Supreme Court applied these principles to the use of a beeper as a law enforcement surveillance technique. In *Knotts,* officers acting without a warrant arranged with a chemical company to place a beeper inside a container of chloroform, which the company sold to a suspected illicit drug manufacturer. The officers then followed the vehicles in which the container was successively placed, maintaining contact both by visual surveillance and by monitoring the beeper. The officers lost the signal from the beeper for about an hour, but later relocated the signal, which was by then stationary at a site determined to be in or near Knotts's cabin. The beeper was not used after officers determined that its signals indicated it had become stationary.

After watching for several days the cabin near which the beeper signals had come to rest, the officers used the tracking and beeper information to secure a search warrant for the cabin and found a drug factory. *Id.* at 1083–84. The district court denied Knotts's motion to suppress the evidence based on the warrantless monitoring, and Knotts was convicted. On appeal, the Eighth Circuit reversed the conviction, concluding that the Fourth Amendment prohibited the warrantless monitoring. The Supreme Court reversed the Eighth Circuit.

The controlling significance of *Knotts* is that the Court's analysis of Knotts's Fourth Amendment rights separated its focus on the legality of the monitoring from

---

district court also found that Butts had possession and control of the aircraft sufficient to confer standing. We do not decide whether Butts had standing to challenge the admission of any incriminating evidence derived from the

installation of the beeper because his standing, or lack of it, does not affect the legality of the monitoring of the beeper or the applicability of the exclusionary rule—the only issues we reach today.

the legality of the warrantless installation. The Court noted that Knotts did not challenge the installation because he believed he lacked the standing necessary to make such a challenge. In passing, it observed that some circuits, including ours, had approved warrantless beeper installations. Then, without resolving whether the *Knotts* beeper was placed in the vehicle in an unconstitutional manner, the Court moved directly to the issue of monitoring. It concluded that because "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," the use of a beeper to aid in monitoring or observing those movements was neither a search nor a seizure under the Fourth Amendment. *Id.* at 1085, 1087.

The beeper used in *Knotts* revealed no more than could have been learned by visual surveillance. The monitoring of the beeper did, however, enable police to determine the whereabouts of the item to which the beeper was attached after visual surveillance had failed. As to the ability of the officers to recapture the lost contact, the Court observed that "scientific enhancement of this sort raises no constitutional issues which visual surveillance would not also raise." *Id.* at 1087.

■ *Knotts* teaches us here that monitoring signals from an electronic tracking device that tells officers no more than that a specific aircraft is flying in the public airspace does not violate any reasonable expectation of privacy. Because this is so, no Fourth Amendment violation results from such public detection. The movement of an airplane in the sky, like that of an automobile on a highway, is not something in which a person can claim a reasonable expectation of privacy. As the Eighth Circuit stated in *United States v. Bruneau,* 594 F.2d 1190 (8th Cir.), *cert. denied,* 444 U.S. 847, 100 S.Ct. 94, 62 L.Ed.2d 61 (1979):

> [W]hat is one's reasonable, subjective expectation of privacy in the airborne location of an airplane? There can be but one answer: none. Today as our airways become more congested, it is imperative that the location of all airborne planes, of every size and type, be carefully monitored. It is risking collision for an aircraft to surreptitiously venture forth into unassigned air space. For this reason, we do not believe anyone flying an airplane today can reasonably expect that he has a right to keep his flying, landing, or take off location private.

594 F.2d at 1196.[2]

*Knotts* deliberately left unanswered not only the question of whether the police conduct that made the monitoring possible violated the Fourth Amendment, but also the question of how such conduct, if illegal, will be dealt with. Butts does challenge the police conduct that made the monitoring of his aircraft possible. In doing so, however, he does not challenge the warrant or its extension. Instead, he bases his motion to suppress on the failure of an officer to carry out the magistrate's command to re-enter the aircraft on or before August 19 to remove the beeper. The panel majority asserted that this failure to remove the beeper within the period specified by the magistrate tainted the monitoring of the signal and that this taint invokes the exclusionary rule to bar all evidence obtained from tracking the aircraft to its landing site. 710 F.2d at 152. This position is unfounded.

■ The purpose of the exclusionary rule is to deter improper police conduct that violates a person's reasonable expectation of privacy under the Fourth Amendment.[3] It does not purport to reach all

---

**2.** The Supreme Court recently granted certiorari in *United States v. Karo,* 710 F.2d 1433 (10th Cir.1983), *cert. granted,* —— U.S. ——, 104 S.Ct. 972, 79 L.Ed.2d 211 (1984). *Karo* concerns the warrantless installation and monitoring of a beeper attached to an object that was tracked onto premises where the defendant had a reasonable expectation of privacy. We need not withhold the decision in this case for the resolution of *Karo* since the surveillance by electronic signal of the interior of a private dwelling in that case is altogether distinguishable from the detection of the public travel identified here.

**3.** Judge Jolly's dissent emphasizes the deterrent effect of the exclusionary rule. At the same time, it concedes that had the beeper been attached to the aircraft without a warrant, the evidence would be admissible. This necessary concession would encourage an officer to act

illegal conduct by officers and is not applicable in the circumstances present here.[4] The action of the officer in installing the beeper did not result in discovery of any evidence at issue. Both the installation of and the failure to remove the beeper were unknown to Butts; therefore, neither the installation nor the nonremoval could have influenced Butts's decision to fly the aircraft in the public airspace. The signal from the then unwarranted beeper did nothing more than enhance the customs official's legal right to observe the aircraft's public movements. No Fourth Amendment right was infringed.[5]

No comparable application of the exclusionary rule is found in the precedent of the Supreme Court or this circuit. Cases tracing the taint of illegal police conduct all concern situations in which an effect of the original illegality provokes the defendant to a subsequent surrender of his Fourth Amendment rights or situations in which illegally obtained evidence enables police to collect private facts. For example, if an illegal arrest causes a defendant to give up other incriminating information before the effect of the prior arrest is attenuated, the exclusionary rule applies. *See Wong Sun v. United States*, 371 U.S. 471, 484–87, 83 S.Ct. 407, 415–17, 9 L.Ed.2d 441 (1963). If officers illegally obtain evidence of criminal conduct and then use that information in an affidavit that causes a warrant to issue for a search or seizure, the ostensibly legal, warranted invasion of privacy falls under the exclusionary rule. *See Alderman v. United States*, 394 U.S. 165, 176–77, 89 S.Ct. 961, 968–69, 22 L.Ed.2d 176 (1969). However, if following an illegal arrest the defendant commits another criminal act in a public area, an officer who would not have seen the defendant but for the illegal arrest may testify to the criminality he later observes in a public place. The officer may also lawfully seize evidence derived from the commission of the subsequent criminal act. *See, e.g., United States v. Bailey*, 691 F.2d 1009, 1016–17 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983); *United States v. Nooks*, 446 F.2d

---

without securing a warrant to avoid any hazard of exclusion. This reasoning would not only subvert deterrence, but also directly conflict with Supreme Court precedent that prefers "police action taken under a warrant as against searches and seizures without one." *United States v. Ventresca*, 380 U.S. 102, 107, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965).

4. We deal in this case with a signal device that remained installed for only two days beyond the warrant-permitted period before it was monitored. As did the Supreme Court in *Knotts*, we pretermit any ruling on worst-case situations that may involve persistent, extended, or unlimited violations of a warrant's terms. *See Knotts*, 102 S.Ct. at 1086.

5. Judge Goldberg's dissent asserts that even if the actions of the customs officers were not a Fourth Amendment violation, the district court could have excluded the marijuana under its supervisory powers. The district court did not so rule and, in any event, should not have.

All cases in which the use of such power has been approved have required a balancing of competing interests. *See United States v. Hasting*, —— U.S. ——, 103 S.Ct. 1974, 1979, 76 L.Ed.2d 96 (1983). Our balancing of interests in today's case produces a result opposite from Judge Goldberg's.

On the one hand, we have the public deprived of truthful evidence that a smuggler has brought a prohibited substance into the country. In addition, we have the evidence discovered not from any invasion of Butts's privacy but from detection of his public conduct. *Elkins v. United States*, 364 U.S. 206, 216, 80 S.Ct. 1437, 1443, 4 L.Ed.2d 1669 (1960), describes the "general need for untrammeled disclosure of competent and relevant evidence in a court of justice." *United States v. Payner*, 447 U.S. 727, 736, 100 S.Ct. 2439, 2447, 65 L.Ed.2d 468 (1979), speaks of the resulting detrimental effect of excluding such evidence.

On the other hand, we have proof that for two days past the time limit fixed by the magistrate a legally installed device remained inside an aircraft. We do not know precisely why it was not removed. The dissent describes the non-removal as "blatantly illegal" and "particularly egregious" conduct that evidences "complete disregard for a court order" and "reprehensible scorn for judicial authority." The record does not support these pejoratives. The installing agent testified he was absent from the area on National Guard duty when the warrant expired. We can know only that the beeper was not removed when the warrant required that it be. For all this record tells us, the presence of the beeper beyond the time limit well could have been due to illness, accident, inadvertence, or bureaucratic bungling.

1283, 1287–88 (5th Cir.), *cert. denied*, 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261 (1971).

■ The exclusionary rule does not apply to deter wrongful or neglectful official conduct that does not involve a breach of the Fourth Amendment. *See Stone v. Powell*, 428 U.S. 465, 486, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976); *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974). This is illustrated by the Supreme Court's latest search and seizure case. In *Michigan v. Clifford*, —— U.S. ——, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), the Court dealt with the admissibility of physical evidence obtained by arson squad investigators who arrived at a burned home well after firefighters, who had extinguished the blaze and departed, and as the house was being boarded up by persons employed by the homeowner's insurance company. Without a warrant, the arson squad entered the premises. They took possession of three gasoline cans and some pieces of ignition apparatus. The Michigan Court of Appeals excluded all the evidence as the product of illegal activity. *Id.* at 645. The Supreme Court affirmed the state court's holding that the arson squad was acting illegally in entering the defendant's property and searching his home at the time it did without a warrant. Despite the illegality of the arson squad's presence on defendant's premises, the Court reversed the exclusion of one of the gasoline cans. This one can had earlier been found in the house by firefighters, but had been removed from the structure and placed in the driveway by a side door. Without detailing whether the can was visible from the public street, the Court held that the defendant's reasonable expectation of privacy in that can had been lost and that the arson squad could seize it for introduction in evidence. If the arson squad had not gone upon the premises illegally, they could not have taken possession of this can. Despite this "if," the Court reversed the exclusion of the evidence in which the defendant had no expectation of privacy, calling it "plain view" material both as with regard to its discovery by the firefighters and its subsequent seizure by the arson squad. *Id.* at 649–50.

REVERSED and REMANDED.

GARWOOD, Circuit Judge, concurring:

I concur in the result. While I agree with most of Chief Judge Clark's persuasive opinion, I write separately to emphasize that the case before us does not present a situation where the party seeking suppression was the owner or lessee of the airplane or had any significant proprietary interest in it.

Though the Government has not expressly challenged the district court's determination that Butts had "standing" to seek suppression of the evidence obtained by the tracking and subsequent search of the plane, this does not require us to treat the case as if the record reflected a state of facts which it plainly does not. The evidence shows that Butts piloted the plane on a trip from Castroville to Seguin on June 18 and once again, over sixty days later, on a trip from Mexico into Castroville in the late evening of August 22 and early morning of August 23, and that when he was arrested on the latter occasion he "said he was ferrying this aircraft for someone from Seguin." There is no evidence, nor any concession by the Government here or below, that Butts ever was, or even claimed to be, the owner or lessee of the plane or that he had any proprietary interest in it.* Since *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), "standing" is not a discrete question, separable from the substantive issues, in this character of case. Rather:

"... definition of ... [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing....

---

\* I note in passing that testimony by an accused at a suppression hearing cannot be used against him at trial on the merits, save possibly for impeachment purposes. *See Simmons v. United*

*States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *United States v. Salvucci,* 448 U.S. 83, 93–94, 100 S.Ct. 2547, 2553–54, 65 L.Ed.2d 619 (1980).

" . . . .

"Analyzed in these terms, the question is whether the challenged search or seizure violated the Fourth Amendment rights of a criminal defendant who seeks to exclude the evidence obtained during it. That inquiry in turn requires a determination of whether the disputed search and seizure has infringed an interest of the defendant which the Fourth Amendment was designed to protect." *Id.* at 140, 99 S.C. at 428–29.

As the Court said in *Rawlings v. Kentucky,* 448 U.S. 98, 106, 100 S.Ct. 2556, 2562, 65 L.Ed.2d 633 (1980), "[a]fter Rakas" the standing and substantive issues "merge into one." And, in *Rakas* the Court likewise made clear that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Id.* 439 U.S. at 130 n. 1, 99 S.Ct. at 424 n. 1.

The only substantial ground urged in support of Butts' motion to suppress is that the "beeper," which allowed the plane to be tracked when Butts flew it from Mexico to Castroville, had by then remained in the plane two or three days after the date by which the warrant extension order had directed that it be removed. Thus the sole question posed is whether the tracking of the plane under these circumstances "has infringed an interest of" pilot Butts "which the Fourth Amendment was designed to protect." *Rakas* at 140, 99 S.Ct. at 429. I would hold that it has not.

In *Rakas* the Court observed that "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized or permitted by society." *Id.* at 143 n. 12, 99 S.Ct. at 430 n. 12. Whatever may be the case with respect to monitoring what is present, said or done on board an aircraft, I do not believe that "understandings that are recognized or permitted by society" serve to "legitimate" the expectations of a pilot, having no proprietary interest in the aircraft, that its movements through the *public* airways will not be tracked by an unauthorized device affixed to the interior of the plane. The presence of such a tracking device may invade the property rights, and perhaps the legitimate expectations of privacy arising therefrom, of one having a proprietary interest in the plane, but that is not the situation before us.

In the analogous case of *United States v. Parks,* 684 F.2d 1078 (5th Cir.1982), we stated:

"But even if [the pilot] Holloway had been legitimately piloting the plane and in possession of its key on April 27, any illegality in the maintenance and monitoring of the beeper would not have infringed any interest of his that the Fourth Amendment was designed to protect.

" . . . .

"The lawfulness *vel non* of the physical presence of the beeper affects the legitimation of Holloway's expectation of privacy only insofar as such expectation can be said to have a source in his property rights. But Holloway has not established that he had any ownership or proprietary rights sufficient for such purpose. Holloway must accordingly base the legitimation of his expectation of privacy on 'understandings that are recognized and permitted by society.' *Rakas v. Illinois, supra. . . .* [T]hose understandings do not furnish a legitimate expectation of privacy in the movements of an airplane through the public airways." *Id.* at 1085, 1087.

In my view, such an approach does not give undue significance to property rights. *Rakas,* though refusing to allow "arcane distinctions developed in property and tort law" to "control" for Fourth Amendment purposes, *id.* 439 U.S. at 143, 99 S.Ct. at 430, nevertheless recognizes that:

" . . . by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment. No better demonstration of this proposition exists than the decision in *Alderman v. United*

*States*, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), where the Court held that an individual's property interest in his own home was so great as to allow him to object to electronic surveillance of conversations emanating from his home, even though he himself was not a party to the conversations." *Id.* at 143–44 n. 12, 99 S.Ct. at 431 n. 12.

And, while it is of course true, as Justice Stewart stated for the Court in *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967), that "the Fourth Amendment protects people, not places," nevertheless it is also true that *what* it protects people from is invasion of "[t]he right ... to be secure in *their* persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). Moreover, Justice Stewart was likewise careful to state in *Katz* that the protections of the Fourth Amendment are neither limited to nor as extensive as the protection of privacy:

> "... the Fourth Amendment cannot be translated into a general constitutional 'right to privacy.' That Amendment protects individual privacy against certain kinds of governmental intrusion, but *its protections go further, and often have nothing to do with privacy at all.* Other provisions of the Constitution protect personal privacy from other forms of governmental invasion." *Id.* at 351, 88 S.Ct. at 511 (emphasis added, footnotes omitted).

The "wrong" or "infringement" here is the agents' failure to comply with the requirement of the warrant extension order that the "beeper" be removed by not later than August 19. Butts never claimed, nor was shown, to have ever had any proprietary interest in the plane. Therefore, as stated by the panel dissent, "Butts was not a victim of that infringement." *United States v. Butts*, 710 F.2d 1139, 1154 (5th Cir.1983). Accordingly, Butts' Fourth Amendment rights were not violated, and his motion to suppress should not have been granted. We need decide no more.

GOLDBERG, Circuit Judge, with whom POLITZ and TATE, Circuit Judges, join, dissenting:

The majority apparently hears the death knell of the exclusionary rule; today's holding swiftly propels that part of our jurisprudence towards its final demise. But I will not be a pallbearer yet—not until the Supreme Coroners have plainly pronounced the exclusionary rule dead. Continuing to adhere to the original panel decision in this case, I retract not a syllable from that original opinion. And, while I wholeheartedly concur in the dissent of my brother, Judge Jolly, my disagreement with the majority's result and reasoning extends further than his. I pause, therefore, to express a few more paragraphs in support of the ideas articulated in the panel opinion and to provide an alternative rationale for the panel's result.

## I.

The en banc court's majority holding, as expressed in the first two sentences of the opinion, is not especially troubling. Under the facts of this case the *act of monitoring* the beeper's signal did not itself constitute an unreasonable search or seizure. The legitimate 4th Amendment inquiry, however, does not end there. This case involves much more than an act of monitoring. Questions concerning the physical presence of the device within a zone of privacy call out loudly for our attention. In order to make possible the tracking of an airplane by means of an electronic device, a customs agent intruded into the interior of a plane and installed a beeper. A warrant authorized that intrusion, but the beeper remained inside the plane past the time that the warrant allowed. Electronic tracking of the plane, in the period after the warrant's expiration, produced evidence that was used to prosecute Butts.

As we held in the panel opinion, the beeper's continued, unauthorized, physical presence inside the plane violated the defendant's 4th Amendment rights. Individuals should be able to reasonably expect that monitoring instrumentalities of the

state will not be present in their protected zones of privacy. For a beeper is more than just the signal that it emits. It is both tangible and symbolic. It constitutes a continuing, constructive presence of the state. The federal officer's initial intrusion into the vehicle interior, required to affix the tracking device, endured as long as the beeper remained.

Today's majority fails to come to grips with, indeed fails to even address, this assault on 4th Amendment protections. This failure flows from a singular emphasis on the *United States v. Knotts*, 460 U.S. 276, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983), and that case's *limited* approval of warrantless beeper monitoring. Coupled with the majority's narrowing of *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and the poisonous fruits doctrine, the emphasis on the act of monitoring produces what I believe is an incredible result.

Three major flaws exist in the majority's train of reasoning. First, the majority's analysis fails to recognize that the various procedures necessary for gathering beeper evidence all work to achieve a single end. While these procedures are indeed separable into installation, maintenance and monitoring components for purposes of some Fourth Amendment analyses,[1] the activities are not separable in terms of their real-world, law enforcement function. Beeper procedures serve a single goal each time they are implemented—i.e., the gathering of evidence that will lead to the arrest and conviction of suspected criminals. A constitutional violation in any of the procedures taints the beeper evidence; for without each procedure the evidence cannot be obtained. Any meaningful constitutional review of the gathering of evidence through the use of beepers must take account of all component procedures. The violation of the Constitution in this case arose out of the maintenance component. Maintaining the beeper inside the plane past the period permitted by the warrant was just as necessary to the law enforcement objective as was the act of monitor-

ing. Failure to recognize the single, overarching function of beeper procedures and failure to scrutinize each procedure for possible illegality has today allowed a constitutional violation to pass without redress.

The majority's reasoning is also flawed because the scope of the exclusionary rule and the poisonous fruits doctrine is not nearly so narrow as today's decision paints it. *Wong Sun v. United States, supra,* commands the exclusion of evidence "come at by the exploitation" of illegality. 371 U.S. at 488, 83 S.Ct. at 417 (1963). In this case, there exists both a causal relationship and a link of purposive behavior by law enforcement officers connecting the illegality to the evidence at issue. But for the installation and continued illegal presence of the beeper, agents would not have come into possession of the tracking information or the physical evidence seized on Butts's arrest. *Knotts's* comparison of beeper monitoring to visual surveillance, to decide an issue concerning the act of monitoring, does not deny the reality that beepers allow police to obtain evidence that they would otherwise be unable to obtain. Much more than just a "but for" relationship, however, exists between illegal beeper procedures and the evidence at issue. The specific purpose of the entire beeper tracking process was realized in Butts's arrest and the seizure of evidence. Moreover, nothing—no passage of time, no act by the defendant, no act by law enforcement officers—appears to purge the illegality tainting that evidence. Indeed, it is hard to imagine a more direct or solid link between the customs official's violation of the law and the evidence at issue.

Precedent, relied on by the majority in narrowing *Wong Sun,* has a very different import in my mind. The analogy drawn between the circumstances in this case and those in *United States v. Bailey,* 691 F.2d 1009, 1016–17 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983) and *United States v. Nooks,* 446 F.2d 1283, 1287–88 (5th Cir.), *cert. denied,* 404 U.S. 945, 92 S.Ct. 299, 30 L.Ed.2d 261

---

**1.** See Majority Opinion p. 1516.

(1971), will not withstand analysis. Both of the latter cases admit evidence obtained subsequent to an illegal arrest. In each case, though, the link between police illegality and the evidentiary fruits was attenuated by the defendant's commission of a second crime. In fact, *Bailey* distinguishes a line of cases that suppress evidence and depend in part on "but for" causation between police illegality and discovery of evidence. *Bailey* actually acknowledges the "but for" causality factor as relevant in *Wong Sun* analyses. 691 F.2d at 1014 n. 3. Despite the existence of a "but for" link in *Bailey*, Judge Anderson found that the commission of a new crime mandated an exception to the traditional *Wong Sun* analysis. In explaining the rationale of its ruling and rationale of this circuit's decision in *Nooks, supra,* the court declared:

> Unlike the situation where in response to the unlawful police action the defendant merely reveals a crime that *already* has been or is being committed, extending the fruits doctrine to immunize a defendant from arrest for *new* crimes gives a defendant an intolerable *carte blanche* to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct. This result is too far reaching and too high a price for society to pay in order to deter police conduct.

*Id.* at 1017. The "high price" incurred when a suspect commits further criminal acts is not relevant in the instant case. Rather, this case parallels closely the cases distinguished in *Bailey*, where the Fifth Circuit suppressed fruits of police misconduct. *See United States v. Beck,* 602 F.2d 726 (5th Cir.1979). (The court suppressed evidence where an illegal stop of a vehicle resulted in defendant's tossing marijuana out of the window); *Fletcher · v. Wainwright,* 399 F.2d 62, 64–65 (5th Cir.1968). (That stolen jewelry was found in a public area was irrelevant and did not render the search outside of the Fourth Amendment. The jewelry had been thrown from a motel window into the courtyard in response to an illegal entry into the defendant's motel room.) It is *United States v. Beck* and *Fletcher v. Wainwright,* rather than *Bailey* or *Nooks,* that control the instant case.[2] The evidence against Butts was the fruit of illegal law enforcement conduct. It was properly suppressed by the court below.

A third flaw in the majority's analysis derives from the emphasis on information conveyed by the beeper. Focusing only upon the incriminating evidence itself, this kind of reasoning reveals an ironic fetishism. Under the majority's interpretation of *Wong Sun,* unless the evidence exudes a special aura that places it into a class of protected matter, the exclusionary rule does not apply. Such an approach turns the exclusionary rule on its head, making the rule appear as an end rather than as a means to an end. The exclusionary rule exists primarily to ensure compliance with the Fourth Amendment. And, the Amendment's purpose is plain from its language: to protect "the right of the people to be secure in their persons, houses, papers, and

**2.** *Michigan v. Clifford,* —— U.S. ——, 104 S.Ct. 641, 78 L.Ed.2d 477 (1983) is not to the contrary. That case holds that the existence of reasonable privacy interests in a fire damaged home impose a warrant requirement on post-fire arson investigations inside the home. The Supreme Court upheld exclusion of evidence found during a warrantless search of the home's basement and upper areas. The Court did not require suppression of a fuel can, discovered by firefighters and subsequently placed in plain view in the home's driveway. With regard to that can, the Court's comments were brief:

> One of the fuel cans was discovered in plain view in the Clifford's driveway. This can was seen in plain view during the initial investigation by the firefighters. It would have been admissible whether it had been seized in the basement by the firefighters or in the driveway by the arson investigators. Exclusion of this evidence should be reversed.

*Id.* at ——, 104 S.Ct. at 649–50.

I can find no discussion to support the *Butts* majority's conclusion that "if the arson squad had not gone upon the premises illegally, they could not have taken possession of this can." Majority Opinion at 1519. Furthermore, I cannot read this cryptic passage by Justice Powell (joined by Justices Brennan, Marshall and White) as making the substantial reduction in Fourth Amendment protections suggested by today's majority. Had the Court intended to impose such a sweeping change in the *Wong Sun* doctrine, it surely would have been much more explicit.

effects, against unreasonable searches and seizures." Losing sight of the constitutional value to be protected and the law's role in protecting that value can lead nowhere but to a wrong result. The costs of that wrong result are today visited upon defendant Butts and upon the whole of society.

## II.

Constitutional values aside but not forgotten, a second justification exists for the district court's suppression of the evidence in this case. Based on his inherent supervisory power, the district judge acted properly in excluding the beeper evidence. The magistrate who had authorized installation of a beeper in the airplane included a clear and unequivocal command in the warrant: "You are also directed to remove the transponder from the aircraft no later than 30 days from the expiration of the *original* court order." While the customs agent sought and received one extension of this 30 day limit, he failed to carry out the warrant's instruction after that extension expired. The magistrate's command, carrying the force of law, gave the defendant a *legal interest* in removal of the beeper. As a direct result of violating federal law, and in derrogation of the defendant's interest, officers were able to obtain evidence against Butts.

The supervisory power is a well established means by which federal courts deter violation of nonconstitutional law. *See United States v. Payner*, 447 U.S. 727, 736 n. 7, n. 8, 100 S.Ct. 2439, 2446–47 n. 7, n. 8, 65 L.Ed.2d 468 (1980); *Rea v. United States*, 350 U.S. 214, 217–218, 76 S.Ct. 292, 294–95, 100 L.Ed. 233 (1956); *McNabb v. United States*, 318 U.S. 332, 341–42, 63 S.Ct. 608, 613–14, 87 L.Ed. 819 (1943). Exercise of that power frequently takes the form of excluding evidence from use in criminal trials. *See, e.g., Elkins v. United States*, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); *Mesarosh v. United States*, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956); *McNabb v. United States, supra,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; *United States v. Cortina*, 630 F.2d 1207 (7th Cir.1980); *United States v. Valencia*, 541 F.2d 618 (6th Cir.1976); *see generally*

"Thirteenth Annual Review of Criminal Procedure: United States Supreme Court and Court of Appeals 1982–83," 72 Geo.L.J. 355 (1983). In *McNabb v. United States, supra,* 318 U.S. at 341–342, 63 S.Ct. at 613–14, the Supreme Court declared:

> The principles governing the admissibility of evidence in federal criminal trials have not been restricted ... to those derived solely from the Constitution. In the exercise of its supervisory authority over the administration of criminal justice in the federal courts, this Court has, from the very beginning of its history, formulated rules of evidence to be applied in federal criminal prosecutions.... Quite apart from the Constitution, therefore, we are constrained to hold that the evidence elicited from the petitioner in the circumstances disclosed here must be excluded. For in the treatment of the petitioners, the arresting officers assumed functions which Congress has explicitly denied them.
>
> The circumstances in which the statements admitted in evidence against the petitioners were secured revealed a plain disregard of the duty enjoined by Congress upon federal law officers....
>
> [T]o permit such evidence to be made the basis of a conviction in the federal courts would stultify the policy which Congress has enacted into law [citations omitted].

318 U.S. at 341–45, 63 S.Ct. at 613–15.

A situation similar to the one that produced the *McNabb* decision exists in the case at bar. An individual has been prosecuted with evidence obtained in violation of federal law. The only difference is that the instant case involves a command from the judicial branch rather than a command of Congress. That difference hardly mandates a different result than the one reached in *McNabb*. Respect for and enforcement of court made law constitutes an important value, as worthy of protection as the mandates issuing from a coequal branch of government. *See Rea v. United States, supra,* 350 U.S. at 217–18, 76 S.Ct. at 294–95. (Discussing a violation of the Federal Rules of Criminal Procedure the Court declared that, "federal courts sit to enforce federal law" and "federal law ex-

tends to the process issuing from those courts.")

Admittedly, in recent cases the Supreme Court has cautioned against overzealous use of the supervisory power in reversing criminal convictions. For example, *United States v. Payner, supra,* 447 U.S. at 735, 100 S.Ct. at 2446, noted that the supervisory power should be applied "with some caution," carefully weighing the interests in preserving judicial integrity and in deterring illegal conduct against the societal interest in presenting probative evidence to the trier of fact. However, in the same case the Supreme Court observed that its decision "does not limit the traditional scope of the supervisory power in any way; nor does it render that power 'superfluous.'" *Id.* at 735–36 n. 8, 100 S.Ct. at 2446–47 n. 8.[3]

I believe that the balancing process in this case requires us to uphold the exclusion of evidence. On one side weighs the important interest always relevant in questions of exclusion: putting probative evidence of the defendant's guilt, the confiscated marijuana, before the trier of fact. But, against that we balance the deterrence of blatantly illegal conduct by law enforcement officers. Here the conduct to be deterred is particularly egregious. A customs agent failed to obey the direct and unequivocal command of a federal magistrate. His actions manifested a complete disregard for a court order. Good faith on the part of that official was notably absent. *See United States v. Williams,* 622 F.2d 830, 841 (1980), *cert. denied,* 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114. (A good faith belief must be grounded in objective reasonableness.)[4] Overall, in view of the

necessity of discouraging such reprehensible scorn for judicial authority, the scale tips towards excluding the evidence. We should uphold the district court's suppression of the evidence.

Adapting our Fourth Amendment jurisprudence to constantly evolving, high technology techniques of law enforcement presents a difficult challenge. We must not close our eyes to possible illegality in such methods just because certain of their component procedures do not violate the law. The potential for seriously eroding respect for the law may well lurk in the other procedures necessary to implementing these ultra-modern police techniques. Today's decision shirks the challenge before us. It beckons a future in which the citizenry's rights to privacy and security will lie atrophied beyond recognition. I must respectfully dissent.

E. GRADY JOLLY, Circuit Judge, with whom GOLDBERG, POLITZ, TATE and WILLIAMS, Circuit Judges, join, dissenting:

I.

To me, the facts of this case upon first reading, left the impression, immediately and intuitively, that the evidence should be suppressed under the general principles of the exclusionary rule. Yet, the panel's analysis, scholarly though it is, gave the impression of a hunt in which the quarry had eluded the hunters. Now we have a majority opinion which is, oddly, so very right and so very wrong—right that the fourth amendment, under the current jurisprudence, does not directly protect the emission of the electronic signal here;[1]

---

**3.** The holding of *Payner* is not controlling in today's case. *Payner* held that the balance of values tilted towards admission of the "tainted" evidence when the defendant was not himself the victim of the challenged practices.

Nor does the Court's recent decision in *United States v. Hasting,* —— U.S. ——, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) suggest that invocation of the supervisory power in this case would be inappropriate. *Hasting* noted that the existence of "means more narrowly tailored" than exclusion of evidence to deter illegality cut against exclusion. However, the decision actually rest-

ed upon the fact that the illegality at issue constituted harmless error in the defendant's trial.

**4.** The existence of good faith, in fact, has been found to be controlling in previous balancings to determine the appropriateness of exclusion. *United States v. Caceres,* 440 U.S. 741, 757–58, 99 S.Ct. 1465, 1474–75, 59 L.Ed.2d 733 (1979).

**1.** While the actual monitoring of the signal is not subject to proscriptions of the fourth amendment, it is evidence which may be tainted, and hence inadmissible, as a result of its emanation from a "poisonous tree."

wrong that that issue is central at all to a determination of whether the marijuana is unconstitutionally tainted.

The issue, I think, is simple and straightforward. The marijuana is the fruit of a fourth amendment wrong committed by the government, that is, the breach of the search warrant. The seizure of the marijuana was brought about by the government's exploitation of its wrong; and it is equally clear that the seizure of the marijuana is not so "attentuated" from the breach of the warrant that the taint of the fourth amendment wrong is "dissipated."

## II.

A search warrant was sought by the government agent to permit an intrusion into the cockpit of the airplane for the purpose of the installation of the transponder based on probable cause that the plane was being used in narcotics traffic.[2] The district court issued a search warrant authorizing the search, but providing several conditions to the search, among them that the "[t]ransponder or beeper to remain in aircraft for a period not to exceed thirty days."[3] On the basis of this search warrant, one night shortly after its issuance, at about 9:00 p.m., two government agents went to the airport where the plane was parked and in the cover of night, opened the main cabin door of the aircraft, entered into the cockpit of the airplane, and installed the transponder—all under the authority of the search warrant.

Under the terms of the warrant, the transponder was to be removed on July 19, 1981. The agents allowed the warrant to expire without removing that transponder. Two days after the thirty-day period had elapsed, customs agents, on July 21, 1981, asked the magistrate to extend the original warrant. This second warrant specifically ordered the agents: "You are also directed to remove the transponder from aircraft N4926B no later than 30 days from the expiration of the original court order (expiration date 07/19/81) that authorized the installation of the electronic equipment." At the end of this second thirty-day period, notwithstanding the explicit command of the court, the transponder remained inside the plane as an active tracking device in violation of the explicit conditions of the warrant which had authorized the search.

As a result of the transponder's remaining in the aircraft in violation of the conditions of the warrant, evidence of the plane's location was obtained, the plane was tracked into Mexico and back into the United States, and upon return, shortly after landing, its pilot was arrested by customs officials who seized the bale of marijuana upon which this prosecution is based.

## III.

In determining whether the marijuana in this case must be excluded as the inadmissible fruit of the poisoned tree, we turn first to the progenitor of this doctrine, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) and examine the facts in that case. There the federal narcotics agents arrested Hom Way, finding heroin in his possession. He stated that he had bought heroin from Blackie Toy. The agents, without probable

---

**2.** I assume, since the majority does not contest the proposition, that there is no disagreement that Butts had a reasonable expectation of privacy in the cockpit of the plane and that the search warrant obtained was necessary to invade that privacy to "search and install" the transponder behind the instrument panel.

It is true that Butts did not own the plane. A person, however, may have a legitimate expectation of privacy in a place or object he does not own. *United States v. Salvucci,* 448 U.S. 83, 92, 100 S.Ct. 2547, 2553, 65 L.Ed.2d 619, 629 (1980); *United States v. Reyes,* 595 F.2d 275, 278 (5th Cir.1979). Butts met his burden of showing that his exercise of possession and control of the

plane evidenced a legitimate expectation of privacy which was infringed by the installation and continued presence of the beeper. Moreover, on appeal, there was no contention that Butts lacked standing to complain of the use of the beeper.

**3.** Whether the intrusion into the cockpit of the plane for the purpose of installing a beeper is a search, seems to be answered here, as a matter of fact, by this particular search warrant which commands the government agent to *"search* and install said transponder and/or tracking beacon (beeper) ...." in the airplane. (Emphasis added.)

cause, invaded Toy's bedroom and arrested him. He denied selling narcotics, but implicated Johnny Yee as someone who had sold the contraband. The agents then entered Yee's residence and he voluntarily surrendered to them an ounce of heroin in his possession. Yee was arrested, and along with Toy, taken to the office of the Bureau of Narcotics where they implicated Wong Sun as a seller of heroin. Toy, Yee and Wong Sun were duly charged, arraigned and released on recognizance. Within a few days each was interrogated at the bureau where they gave incriminating statements.

When considered by the Supreme Court, at issue was the admissibility of: (1) the statements made by Toy in his bedroom, (2) the heroin obtained at Yee's apartment, (3) Toy's post-arrest statement, and (4) Wong's post-arrest statement. The Court held that Toy's statement made in his bedroom was the fruit of the unconstitutional invasion into his living quarters and was thus inadmissible. The Court further held that the exclusion of Toy's bedroom declaration required the exclusion of the narcotics taken from Yee as the fruit of the unlawful invasion into Toy's living quarters and could not be used against Toy. In holding that the narcotics were the fruit of the unlawful invasion into Toy's quarters, the Court noted that the prosecutor had admitted that the drugs would not have been found except for the help provided by Toy in his bedroom declaration. The Court specifically noted that under these facts it could not be said that the narcotics were evidence derived from an independent source, nor was it a case in which the connection between the police misconduct and the evidence had become so attenuated as to dissipate the taint.

In evaluating the evidence that follows illegal police misconduct, the test to apply is not, Justice Brennan wrote, whether the evidence would have come to light "but for" the illegal actions of the police; rather, the question to be determined is whether the evidence results from exploitation of the illegality or whether it results from means sufficiently distinguishable from the illegality so as to be free of the initial taint.

Applying that test, the Court concluded that the narcotics surrendered by Yee were the poisonous fruit of the unlawful invasion of Toy's living quarters. The narcotics were, the Court held, the result of the exploitation of that original illegality and could not be introduced into evidence against Toy.

Turning to the two remaining issues of the post-arrest statements, the Court found it unnecessary to rule whether Toy's post-arrest statement was the fruit of the illegal arrest. Regarding Wong, however, the Court, while agreeing with the lower court that his initial arrest was illegal, held that his confession, made several days later while free on his own recognizance, was properly admitted. Since he was on his own recognizance and had voluntarily returned to the bureau several days later to make the statements, the connection between his initial arrest and the subsequent confession had "become so attentuated as to dissipate the taint." *Id.* at 419.

Whether the connection between the illegal conduct and the questioned evidence is attenuated is largely a fact question to be determined and evaluated in each case. Our court, however, has undertaken such an evaluation on two rather recent occasions, and provided some factors to be considered. In *United States v. Brookins*, 614 F.2d 1037 (5th Cir.1980), Judge Vance (now of the Eleventh Circuit) wrote extensively on the subject. He pointed out that *Wong Sun, supra*, barred the fruits of the poisonous tree only if the fruit is sufficiently connected to the "illegal tree" *Brookins*, 614 F.2d at 1041. He outlined three forms of insufficient connection: where the link between the illegal conduct and the subject evidence had become attenuated; where the evidence had an independent source apart from the illegal conduct; and where the evidence inevitably would have been discovered during the police investigation without the aid of the illegal source. It was the court's task in *Brookins* to evaluate the attenuation of the connection between illegal police conduct and a witness whose name was adduced in the illegally obtained statement and whose testimony

the defendant sought to suppress. Among the factors considered were whether the testimony was the act of the witness's own free will; whether substantial time periods had elapsed between the illegal conduct and police contact with the witness; whether the identity of the witness would have been discovered by the police in a routine investigation, and whether the illegal conduct of the police in the first place was innocent or wilful. Even if the consideration of these factors indicated that the evidence was not attenuated from the illegal conduct, the court must weigh the application of the exclusionary rule against the social costs of suppressing the evidence, and in particular, the court should determine whether the application of the exclusionary rule provided some deterrent effect on the behavior of police officers. *Id.* at 1043.[4]

Obviously, most of these factors do not fit the facts of the case we consider here today, and simply underscore our earlier statement that whether the subject evidence has become so attenuated from the illegal conduct of the police is a fact question to be evaluated in each case. Perhaps of more significance to our consideration is the emphasis that Judge Vance gave, in the context of applying the fruit-of-the-poisoned-tree doctrine, to the general purpose of the exclusionary rule. He noted that recent Supreme Court decisions make it clear that the exclusionary rule does not rest upon the Constitution, but rather is a judicially created remedy to be applied only when it advances its judicial purpose. *Id.* at 1046. He further noted that the single and distinct purpose of the exclusionary rule is deterrence of police violations of that constitutional protection against unreasonable searches and seizures. *Id.* at 1047.

A second recent case dealing with the subject we discuss today is *United States v. Tookes,* 633 F.2d 712 (5th Cir.1980). Tookes was an individual known to police as a convicted felon and drug offender. When the police approached him, he ran, was caught by the police, frisked from head to toe, found clean, but arrested anyway. The police officer began searching the area for anything that Tookes could possibly have thrown away while being chased. The officer's search took him back to the vicinity of Tookes' truck where he observed from the outside and in plain view on the seat next to the driver, a semi-automatic pistol. The defendant was then placed under arrest again, this time for possession of a firearm by a felon. At trial, Tookes moved to suppress the gun as the fruit of the illegal first arrest. Judge Roney, writing for the court, held that the connection between the unlawful arrest and the seizure of the gun was not attentuated. He noted three factors to be considered in determining whether there was sufficient connection between the illegal conduct and the questioned evidence: (1) the proximity of the two in time and distance; (2) the presence of intervening circumstances between the arrest and the discovery of the evidence, and (3) the circumstances under which the arrest was made. He noted that the discovery of the evidence was soon after the arrest had been made and that there had been no significant intervening circumstances. He emphasized that the arrest was a gross violation of legal processes and the taint could not thus easily be removed. He admitted that the gun was in plain view and conceivably could have been discovered in the absence of the arrest but found that the "temporal" and "spatial" proximity of the illegal conduct and the discovery of the evidence made it clear that the two were interrelated. *Id.* at 716.[5]

---

**4.** In delineating the three forms of inadequate connection between fruit and tree, Judge Vance relied on four Supreme Court decisions: *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Nardone v. United States,* 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (1939); *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); and

*Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

**5.** This same method of determining whether evidence falls within the general exclusionary bar against use of the fruits of an unlawful search, arrest, or seizure was used in *United States v. Miller,* 666 F.2d 991, 995 (5th Cir.1982).

## IV.

In determining the admissibility of the marijuana in this case, we turn to *Wong Sun* as the primary authority for our analysis. *Wong Sun* tells us that the facts are not to be analyzed pursuant to the approach that "but for the illegal conduct the evidence would never have been adduced"; rather, we are to determine whether the evidence here arises from the government's exploitation of the warrant's breach and whether the connection between the warrant's breach and the marijuana is so attenuated that the illegal taint has become dissipated. Both *Brookins, supra,* and *Tookes, supra,* though in parts irrelevant to the facts we must examine today, are helpful in giving us some understanding of how we have discussed and applied the *Wong Sun* doctrine in other cases in this circuit.

First, we compare the fourth amendment wrong in *Wong Sun* and in our case. In *Wong Sun,* the fourth amendment wrong was the unlawful invasion into his living quarters without a search warrant and without probable cause to believe that Wong Sun had committed a crime. In our case, there were no exigent or emergency circumstances, and the government agents properly went to the magistrate and applied for a search warrant. The court issued the search warrant permitting the agents to intrude into the cockpit of the plane at nighttime to "search and install said transponder and/or tracking beacon (beeper)." The terms of the warrant expressly provided that "[t]ransponder or beeper to remain in aircraft for a period not to exceed thirty days." A thirty-day extension of the warrant was granted. In granting the extension, the court specifically directed the customs agents to remove the transponder at the end of that period. The court said, in effect, to the government agents: it is reasonable to surreptitiously enter the plane, go into the cockpit, and install the transponder *if* you allow it to remain no longer than thirty days; if the tracking device remains in the plane longer than thirty days, this invasion scheme, which you seek to use as an investigative tool, is unreasonable.

The second thirty-day period expired on August 19, 1981. Three days later the transponder emitted the evidence leading to the location and seizure of the marijuana. Giving the term "exploit" its commonly accepted meaning of "taking advantage of" or "using," there should be no quibbling that the government agents exploited their failure to act in accordance with the terms of the warrant. The government agents had been ordered by the court to remove the transponder; they had failed to act according to the terms of the warrant; because they had breached the terms of warrant, evidence, i.e., electronic emissions indicating the plane's location, came into their possession; they immediately began acting on that evidence by tracking the plane; and ultimately, based on the evidence emitted in violation of the warrant, that is, emitted after the expiration of the thirty-day period, they located the marijuana. This conduct is exploitation of a fourth amendment wrong, in the clearest sense.

Furthermore, when we compare the chain of evidence in this case with that set out in *Wong Sun,* it is clear here that between the fourth amendment wrong and the evidence seized there is no attenuation which can be said to dissipate the taint. The chain of evidence is almost identical to that in *Wong Sun.* In *Wong Sun,* heroin was obtained from Yee because his location was known because of a statement that was given by Toy which resulted from the fourth amendment wrong of the police. Here, the marijuana was seized because the police knew of its location because of the electronic signal which resulted from a fourth amendment wrong of government agents. Thus, from the juxtaposition of the facts in this case with those in *Wong Sun,* it is clear that the authority of that case is "on all fours" that the subject evidence here was not attenuated from the breach of the warrant and the misconduct of the government in failing to remove the transponder.

While certainly it is clear that we need go no further than the authority of *Wong Sun,* we do note in passing that when applying the relevant criteria noted in

*Brookins, supra,* and *Tookes, supra,* the evidence here does not fit into any of the categories which should be excepted from the fruit-of-the-poisonous-tree doctrine. There was no significant amount of time which passed between the fourth amendment violation and the seizure of the evidence; there is no indication whatsoever in our case that the evidence would have been discovered by the police in the absence of the breach of the warrant; the breach of the warrant did not result from innocent activity on the part of the police who were, at best, wilfully negligent in complying with the terms of the warrant.

Finally, *Brookins* emphasizes as a major consideration the effect the exclusion of the evidence will have on discouraging illegal conduct on the part of law enforcement officers. In this regard the exclusion of the evidence here serves a major purpose. The majority opinion allows police to ignore the conditions of reasonableness imposed on their conduct by court-issued search warrants without adverse consequence. Under the court's ruling today, police officers may, with immunity, allow transponders to track the comings and goings of an individual indefinitely, notwithstanding what the judge says. Court enforcement of protections against invasions through electronic devices is difficult enough to control effectively without further diluting the relevance of the fourth amendment as does the holding of the majority today. Thus, to me, application of the exclusionary rule to the marijuana in this case is all the more important for the effect it will have on future police conduct.

### V.

In conclusion, I must dissent from the majority's opinion. I should make it clear that I do not disagree that the fourth amendment does not protect Butts from the monitoring of the transponder in his airplane. I agree that Butts had no expectation of privacy to be free of the tracking of his plane in the airways. If the transponder had been warrantlessly attached to the exterior of the plane, I would have no occasion to complain about the admissibility of the evidence here in question. But the majority does not only focus on the monitoring as the source of the marijuana, it treats the monitoring as though it were an isolated, independent act without a history preceding it. The majority ignores that the monitoring and the recovery of the marijuana resulted from an exploitation of a fourth amendment wrong, the failure of the agents to comply with the specific conditions and terms of the search warrant. That is my difference with the majority, and that is why I dissent.