**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Robert Lavon NOOKS, Sinclair Hughes and John Henry Brown, Defendants-Appellants.**

**No. 29334.**

United States Court of Appeals,
Fifth Circuit.

May 19, 1971.

Rehearing Denied June 7, 1971.

Rehearing and Rehearing En Banc
Denied July 7, 1971.

---

James E. Yates, III, Savannah, Ga. court appointed, for Hughes.

Thomas F. Walsh, Savannah, Ga., court appointed, for Nooks.

J. Ralph Beaird, C. Ronald Ellington, Athens, Ga., court appointed, for Brown.

John Henry Brown, pro se.

R. Jackson B. Smith, Jr., U. S. Atty., Augusta, Ga., Richard C. Chadwick, Asst. U. S. Atty., Savannah, Ga., for plaintiff-appellee.

Before RIVES, GOLDBERG and MORGAN, Circuit Judges.

RIVES, Circuit Judge:

Nooks, Hughes and Brown were jointly indicted, tried and convicted for the crime of bank robbery in violation of Section 2113(a) (d), Title 18, United States Code.[1] The court imposed sentences of imprisonment of twenty (20)

---

1. "(a) Whoever, by force and violence, or by intimidation, takes or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association; or

\* \* \* \* \*

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

years on Nooks and Hughes, and twenty-five (25) years on Brown.

As to each appellant the only substantial questions presented for review are: (1) Did the district court err in admitting in evidence the fruits from the search of the automobile in which he was apprehended; (2) did the district court err in admitting as evidence in-court identification of appellant; and (3) is the verdict invalid because of its form? We decide the questions against the appellants and, finding no reversible error, we affirm each of the judgments of conviction.

## I.

The contention most seriously urged is that, in denying the appellant's[2] motion to suppress and in admitting into evidence the fruits of the search of the automobile, the district court violated the Fourth and Fourteenth Amendments to the United States Constitution. Decision of that question requires a detailed consideration of the relevant evidence. On the facts pertinent to this issue, there is little or no dispute among the attorneys on appeal.[3] The appellee's counsel candidly concedes that "The statement of the case and statement of facts as they appear in the brief on behalf of John Henry Brown, appellant, and the brief on behalf of Sinclair Hughes, Jr. and Roger Lavon Nooks, appellants, are substantially correct." We therefore quote at some length from the brief on behalf of appellant Brown:

"On November 25, 1968, at approximately 12:45 P.M. the Bank of Stapleton in Jefferson County, Georgia, was robbed by three Negro men, one of whom was armed with a pistol (R. 254). The robbers ordered three bank employees and a customer into the vault, took money from the tellers' windows and escaped.

"Six or eight minutes later, John C. Kilgore, Jr., the head cashier and vice-president of the Bank notified the Federal Bureau of Investigation office in Augusta and the Georgia State Patrol station in Thompson, Georgia, of the robbery (R. 150).

"At approximately 1:00 o'clock P.M. the Sheriff of Jefferson County, Zollie Compton, was notified of the robbery. He, in turn, called the local Georgia Bureau of Investigation Agent, Don Branch, and they proceeded to the Bank of Stapleton. Witnesses at the Bank informed Sheriff Compton and Agent Branch that the robbers had escaped in a white 1969 Chevelle Chevrolet with a paper tag from Dunlap Chevrolet in Augusta (R. 63). This detailed description of the getaway car along with the information that three Negro men were involved was broadcast over the police radio by the Georgia State Patrol station at Thompson.

"Alerted by the radio broadcast to be on the lookout for a late model white Chevrolet with three Negro occupants, local police officers began the search. * * * The Sheriff of Warren County, Alton R. Dye, also heard the radio broadcast, and he proceeded alone to the intersection of Georgia 16 and 16-C on

---

* * * * *

"(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both."

Subsection (f) is also pertinent:

"(f) As used in this section the term 'bank' means any member bank of the Federal Reserve System, and any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, and any bank the deposits of which are insured by the Federal Deposit Insurance Corporation."

2. This contention being virtually the same as to each appellant, for simplicity we use the singular form.

3. We have nonetheless carefully read and studied the entire record.

the Warren-Glascock County line at a point about six miles from Stapleton. Sheriff Dye testified that at this time he had a description of the getaway car (R. 224) and a 'vague description' of the robbers (R. 306). As to the robbers themselves, Sheriff Dye admitted that he knew only that 'three colored males' were involved and that he had no more detailed information as to their size, distinguishing physical characteristics or dress (R. 224, 306–07).

"Sheriff Dye parked his car at the highway intersection and stood beside it with his rifle laying across the top of his car (R. 308). At approximately 2:00 P.M. Sheriff Dye observed Appellant Brown—a Negro male—driving pass (sic) the intersection toward Warrenton at a lawful rate of speed, apparently alone, in a 1964 yellow Buick convertible with a black top. Appellant's car was the fourth automobile to pass the intersection after the Sheriff arrived (R. 170).

"According to Sheriff Dye, Appellant, as he drove pass (sic) 'threw up his hand and waved at me, and as he continued on north he kept looking back at me and veering to the left across the center line.' (R. 224).

"Suspicious, Sheriff Dye pulled Appellant's car over by using his red lights (R. 230). Sheriff Dye told Appellant to get out of his car and to hand over his driver's license—which Appellant did (R. 225).

"As Sheriff Dye checked Appellant's driver's license, he testified that Appellant "got to being a little nervous." (R. 225). He further testified that Appellant was talking a lot:

"'He never did quit talking. This boy talked about me and my people, my father. He was born and raised in about a mile from where I was. He knew me. At the time I didn't know him. It had been years since I had seen him.' (R. 225).

"During this time, according to Appellant, Sheriff Dye searched Appellant's automobile:

"'He (Dye) went under the front seat and back of it and looked around over the inside of the car.' (R. 208).

"Although Sheriff Dye saw nothing incriminating in the car, he testified that he thought he heard a sound which he could not identify come from the trunk:

"'I heard a rustling or something in the trunk of this automobile. I don't know what kind of sound it was, but it was a movement of some type. * * *' (R. 225).

"Sheriff Dye later testified that the sound could have been made by some cargo shifting (R. 238), and he surmised Appellant might have been hauling liquor because the car was sagging in the rear and had mud and grass underneath it (R. 230). Sheriff Dye admitted that he had no actual basis for his suspicion that Appellant was carrying liquor and stated:

"'I stopped the car because he was acting suspicious toward me. He was looking back at me and got on the wrong side of the road. *I knew there was something wrong. I didn't know what.*' (R. 231) (Emphasis added.)

"At this point Sheriff Dye asked Appellant for the key to open his trunk and Appellant replied that he did not have it (R. 225).[4]

"Sheriff Dye himself looked and saw that there was not another key in the ignition switch (R. 225).

"Based merely on his suspicion that there was 'something' in the trunk which appellant did not want him to see, Sheriff Dye placed Appellant under arrest (R. 238) by placing Appellant's driver's license in his pocket (R. 225) and by ordering Appellant to drive to the Chevrolet dealer in Warrenton so the trunk could be opened by a locksmith (R. 225, 233).

4. The key was later found concealed in one of Brown's shoes.

"Sheriff Dye candidly admitted that there was nothing about the car or the driver which identified either with the bank robbery (R. 317) and, furthermore, at the time of arrest he had *no concrete evidence* that Appellant had any connection with the robbery of the Bank of Stapleton (R. 238). Significantly, Sheriff Dye stated that if he had sought to obtain a search warrant from a magistrate at this point, he would not have known what reason to give:

" 'No, sir, I didn't know what for. *I didn't know what I was looking for but I knew I was going to look in the trunk of that car.'* (R. 239) (Emphasis added.)

"As ordered by Sheriff Dye, Appellant, under arrest, proceeded toward Warrenton driving his own car (R. 311) followed closely by Sheriff Dye. It was at this point when Sheriff Dye radioed a description of the man he now had in custody that Sheriff Compton in another patrol car informed Sheriff Dye that the man he had just arrested fit the description of one of the robbers of the Bank of Stapleton (R. 311, 319–21, 226–27, 237–38).

"A few minutes later, the procession of Appellant and Sheriff Dye toward Warrenton was intercepted by Agent Herndon [of the Georgia Bureau of Investigation] and all three cars stopped. Agent Herndon re-checked Appellant's driver's license and his tag number which verified the bill of sale Appellant had exhibited for his Buick. The three cars then continued on toward Warrenton—Agent Herndon leading, Appellant in the middle and Sheriff Dye behind Appellant.

"As the procession passed a major highway intersection, Appellant in the middle vehicle turned left sharply and quickly accelerated. Sheriff Dye gave chase and Agent Herndon who had driven by the intersection spun his car around and joined the chase which reached speeds up to 115 m.p.h. (R. 125).[5] Herndon radioed the cars position and a roadblock was set up by other police officers, one of whom shot out the tires on Appellant's Buick.

"Appellant got out of his car with his hands up surrounded by law enforcement officers with guns drawn (R. 65, 91, 92, 132, 138). Sheriff Dye in hot pursuit ran up to Appellant and hit him in the back of the head with the butt of his rifle (R. 139). Appellant was handcuffed as he lay on the ground.

"When Appellant emerged from his automobile, it rolled into a nearby ditch. As officers searched the inside of the car, they were surprised (R. 74) to see two men looking up at them from the trunk through the torn flap into which the top of the covertible folds[6] (R. 66). The trunk was then pried open with a crowbar and codefendants Nooks and Hughes and a box of money were discovered. A gun was discovered on the floor board under the front seat (R. 67). Nooks and Hughes were placed under arrest and handcuffed.

"The government stipulated at the October 3, 1969 hearing on defendant's motions to suppress that no search warrant or arrest warrant was obtained during this critical period (R. 57)."

The briefs and arguments on appeal focus on the validity of Sheriff Dye's arrest of Brown at the time that he placed Brown's driver's license in his (Dye's) pocket and ordered Brown to drive to the Chevrolet dealer in Warrenton. Much, however, intervened between that time and the search of the automobile, including the following: (1) Dye heard from Sheriff Compton that Brown's description fitted the description of one of the robbers of the Bank of Stapleton. (2) Brown precipitately and forcibly attempted to escape from

---

5. Sheriff Dye testified also that Brown shot three times directly at him (Dye).

6. There was also undisputed evidence that the two men cried out "don't shoot in here, don't shoot in here." (R. 184, 333) and the record leaves uncertain which came first, the visible evidence or the audible evidence of their being in the trunk.

Dye's custody and fled driving at speeds up to 115 m.p.h. (3) During that flight, he shot directly at Sheriff Dye. (4) The presence of two other men in the trunk of the automobile was unmistakably revealed both visually and audibly.

■ Before the trunk of the automobile was opened it had become academic whether Brown's original arrest was lawful or not. Brown's description and his precipitate flight had furnished additional evidence to show probable cause for his arrest and for the search of the automobile. Further, Brown had committed another crime by shooting directly at Sheriff Dye. Indeed, it became necessary to open the trunk to rescue Nooks and Hughes, as well as to arrest them. Under the circumstances known at the time of the actual search of the automobile, there can be no doubt as to the validity of that search. The nexus between that search and Brown's original arrest had been attenuated. The fruits of that search cannot realistically be treated as fruits of Brown's original arrest. We need not, therefore, pass judgment on the lawfulness, vel non, of that arrest.

■ We hold simply that, at the time the trunk of the automobile was opened and the automobile was searched, probable cause existed for the arrest of all three, Brown, Nooks and Hughes; the search of the automobile incident to that arrest was "reasonable"; and the relevant fruits of that search were admissible in evidence.[8]

II.

Brown, Nooks and Hughes were positively identified as the bank robbers by John C. Kilgore, Jr., Vice President and Cashier of the Bank, by Mrs. Edna A. Kilgore, Assistant Cashier of the Bank, and by Paul H. Swint, the only customer

7. Judge Sibley said in Aderhold v. Soileau, 1933, 5 Cir., 67 F.2d 259, 260:
 "A prisoner in a penal institution whose sentence is irregular or voidable may not for that reason, and before some court has so adjudged, defy his guards and run away. A difference of opinion might cause a death. Such a doctrine would set discipline at naught."
 Compare 27 Am.Jur.2d Escapes §§ 7 & 8, p. 854; Annotation 70 A.L.R.2d 1440; Georgia Code Ann. 26-4506, 26-4510.

8. That holding is sustained and required by the controlling principles and precedents, of which we mention a few. It is only unreasonable searches and seizures which are forbidden by the Fourth Amendment. "The test of reasonableness cannot be stated in rigid and absolute terms." Harris v. United States, 1947, 331 U.S. 145, 150, 67 S.Ct. 1098, 1101, 91 L.Ed. 1399.
 "The word 'reasonable' is not to be construed in the abstract or in a vacuum unrelated to the field to which it applies. Standards which might be reasonable for the apprehension of bank robbers might not be reasonable for the arrest of narcotics peddlers."
 United States v. Kancso, 2 Cir. 1958, 252 F.2d 220, 222.
 "In dealing with probable cause * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical con-

siderations of everyday life on which reasonable and prudent men, not legal technicians, act. The standard of proof is accordingly correlative to what must be proved.
 " * * * Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 288, 69 L.Ed. 543]."
 Brinegar v. United States, 1949, 338 U.S. 160, 175, 176, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879.
 Before the car was searched, Brown's detention had become an arrest for robbery and the search of the car was incidental to that arrest and to the arrests of Nooks and Hughes. See Brown v. United States, 1966, 125 U.S.App.D.C. 43, 365 F.2d 976, 979.
 The search of the car occurred on November 25, 1968, prior to the decision in Chimel v. California, decided June 23, 1969, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685. Chimel is not applicable to searches antedating that decision, Williams v. United States, decided April 5, 1971, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388; Hill v. California, decided April 5, 1971, 401 U.S. 79, 91 S.Ct. 1106, 28 L.Ed.2d 484.

of the Bank at the time of the robbery. After their arrest, all three of the accused were placed in Sheriff Compton's car and were driven to the Bank by Sheriff Compton and Agent Branch. The car with the three accused handcuffed in the back seat was parked about ten or fifteen feet from the front of the Bank while Sheriff Compton returned the money which had been recovered. There were at least four police cars at the scene of the final arrest of the three accused and no necessity was shown for driving these accused men to the Bank. The testimony is conflicting as to whether Mr. and Mrs. Kilgore viewed them in the Sheriff's car. Brown, Nooks and Hughes so testified. Mr. Kilgore admitted going out on the sidewalk and seeing the car with several people sitting in it, and hearing the Sheriff say, "We got them," but denied going out and identifying anybody in the car. Mrs. Kilgore denied seeing the vehicle in which the three accused men were riding. Both Mr. and Mrs. Kilgore admitted seeing pictures of the three men in a local newspaper. The caption above the pictures read "Sheriff Compton and Deputies Catch Stapleton Bank Robbers." Underneath each of the pictures in the newspaper appeared the name and home address of the accused whose photograph had been reproduced. Certainly the photographs, which were mug shots taken after the arrests, should not have been furnished to the press and published in this manner. A copy of the newspaper is certified as an original exhibit on appeal. The pictures are extremely dark and unclear. Both Mr. and Mrs. Kilgore made positive identification of their observation of them while they were in the Bank committing the crime and not on any picture or on other views of the defendants. Mr. Swint, the customer in the Bank, was equally positive the three defendants as the bank robbers, and testified that they relied on in his identification of the three defendants. There is no contention that Mr. Swint viewed pictures of the accused or the defendants themselves on any occa-sion other than the robbery. There is no indication in the record that any formal line-up was ever conducted. In summary, Swint's in-court identification of the defendants was completely untainted, and the testimony of Mr. and Mrs. Kilgore was admissible for the jury's consideration.

When all is said and done, there can be no real doubt as to the identity of the defendants. They were captured in the act of fleeing with the loot from the bank robbery. Within two hours of the robbery (R. 260) the exact amount of money stolen, with clearly identifying bank papers, was recovered from the trunk of the automobile in which the defendants were riding (Brown in the driver's seat and Nooks and Hughes locked in the trunk) and was returned to the Bank. Under circumstances so shrieking of guilt, if there were any error in admitting evidence of in-court identification, it would be error without injury, "harmless beyond a reasonable doubt." Chapman v. California, 1967, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705.

### III.

As to Brown, the jury returned the following verdict (R. 381):

"We, the jury, find the defendant, JOHN HENRY BROWN, Guilty of Robbery of a Bank accompanied by an assault or the putting in jeopardy of the life of another by the use of a dangerous weapon, as charged in the Indictment.

"This 27 day of October, 1969.

Jerry Robbins
FOREMAN"

Verdicts in identical form, except for the defendant's name, were returned as to Nooks and Hughes.

Appellants contend that the verdicts are invalid because of the connective "or" between the word "assault" and the words "putting in jeopardy of the life of another by the use of a dangerous weapon." The argument is that there is no sufficiently definite finding that the defendant did either alternative.

As noted at the outset of this opinion, the indictment charged the defendants with violating Section 2113(a)(d), Title 18, United States Code. The indictment employed, however, the conjunctive "and" instead of "or." In using "or" the verdicts follow the language contained in Section 2113(d).[9] The verdicts followed a form submitted (along with forms for two other possible verdicts) to the jury by the court and explained at length in the court's charges (R. 353, 356, 358, 365–367). At the conclusion of the court's charge, out of the presence of the jury, the court asked for any objections to the charge. Counsel for each of the defendants responded, "No exceptions, your Honor." (R. 369). When the jury returned its verdict as to each of the three defendants, no objection was made to the form of the verdict and counsel waived polling of the jury. See Rule 31, Fed.R.Crim.P.

 The verdict of the jury should be construed with reference to the indictment, the court's charge, and the entire record to arrive at the intention of the jury, and all fair intendments should be made to sustain the verdict.[10] So construed, we find the verdicts sufficiently definite and valid. There is no inconsistency between the two alternatives. That is especially true in the light of the definition of "assault" in the district court's charge: "Any willful attempt or threat to inflict injury upon the person of another when coupled with an apparent present ability to accomplish that purpose and an intentional display of force such as would give the victim reason to fear or expect to be in bodily harm constitutes an assault." (R. 358) Certainly the forms of the verdicts do not constitute plain error which should be noticed although not brought to the attention of the district court. Rule 52(b), Fed.R.Crim.P.

9. Quoted in footnote 1, *supra*.

10. See authorities collected in 23A C.J.S. Criminal Law § 1409; 53 Am.Jur.Trial §§ 1077, 1078, 1093.

We find no reversible error in the record, and the judgments of conviction are therefore

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35, Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12), the Petition for Rehearing En Banc is denied.