**UNITED STATES of America,**

v.

**Phoenix GOINES, Defendant.**

**No. 08–CR–503 (FB).**

United States District Court,
E.D. New York.

March 31, 2009.

534

Benton J. Campbell, Esq., United States Attorney, Eastern District of New York, by Anthony M. Capozzolo, Esq., Assistant United States Attorney, United States Attorney's Office, Brooklyn, NY, for the United States.

Deirdre D. Von Dornum, Esq., Federal Defenders of New York, Inc., Brooklyn, NY, for Defendant.

### *MEMORANDUM AND ORDER*

BLOCK, Senior District Judge:

Phoenix Goines ("Goines") is charged with the possession of a firearm despite having been convicted of "a crime punishable by imprisonment for a term exceeding one year," in violation of 18 U.S.C. § 922(g)(1). He moves to suppress the firearm and ammunition seized from his person by law enforcement on the ground that the seizure violated the Fourth Amendment. An evidentiary hearing was held on February 26, 2009. For the following reasons, the motion is granted.

**I**

█ The facts herein are taken primarily from the evidentiary hearing before the Court, at which testimony was heard from, *inter alia*, Goines and arresting officer

Paul D. Herrmann ("Herrmann"). Herrmann has also testified under oath about these events on several prior occasions: (1) on January 18, 2008, before a New York state grand jury;[1] (2) on February 8, 2008, at Goines's state parole hearing;[2] and (3) on July 24, 2008, before a federal grand jury. Herrmann also described aspects of these events in a contemporaneously filed police report. The Court notes below where material inconsistencies exist between Herrmann's testimony before the Court and his prior descriptions of these events.[3]

On the evening of January 15, 2008, Herrmann, a New York City police detective, was seated with two fellow officers in an unmarked SUV parked in a lot adjacent to the 1008 Saint Marks Avenue housing complex in Brooklyn.[4] At approximately 8:50 p.m., Herrmann saw three young men walk in front of the vehicle. Herrmann claims that they passed about five feet from the front of the car. *See* Evid. Hr'g Tr. at 29:13–14. Previously, however, Herrmann had testified that the young men passed about 20 feet away from him, *see* Ex. 3500–PH1 (hereinafter, "Parole Hr'g Tr.") at 22:16, and that they passed 20–25 feet away, *see* Ex. 3500–PH–11 (hereinafter, "State Grand Jury Tr.") at 13:6.

Two of the young men were walking side by side; the third, Goines, walked behind the other two. Herrmann testified that Goines was walking "a foot" behind the

others, Evid. Hr'g Tr. at 110:21, while Goines testified that he was "seven [or] eight feet" behind them. *Id.* at 135:22. Herrmann testified that it appeared that the three men were talking to one another, though he acknowledged that he could not hear them and did not explain what gave him the impression that they were speaking. Goines, on the other hand, testified that he did not know the two individuals and was not interacting with them. Herrmann testified that the two young men walking abreast were passing back and forth what appeared to be a marijuana cigarette; Herrmann testified at the evidentiary hearing and at the parole hearing that he did not see Goines holding or smoking marijuana at that time. Before the state grand jury, however, Herrmann testified that he "observed [all] *three* males ... smoking marijuana." State Grand Jury Tr. at 6:22–23 (emphasis added). Similarly, before the federal grand jury, he testified that he saw "*three males* ... smoking marijuana." Ex. 3500–PH–18 (hereinafter "Fed. Grand Jury Tr.") at 7:2–4 (emphasis added).

The three officers exited the vehicle and approached the three young men. Herrmann claims that as he approached Goines, he saw Goines flick a small object to the ground which he had been holding either "cupped" in his hand, Evid. Hr'g Tr. at 19:18, or "in his two fingers," *id.* at 46:12–13. Herrmann testified that he believed

---

1. The State of New York began to prosecute Goines in connection with these events, but opted not to continue. The federal prosecution of Goines followed.

2. At the time of these events, Goines was on parole after having been convicted by a New York state court of credit card theft.

3. While the Court could rely on evidence from the underlying record not adduced at the evidentiary hearing in deciding the present motion, *see United States v. Worjloh,* 546 F.3d

104, 109 (2d Cir.2008); *United States v. Theriault,* No. 8:07–CR–200 (GLS), 2008 WL 942568, at *1 n. 1 (N.D.N.Y. Apr. 7, 2008), it is unnecessary here, as Herrmann was cross-examined using his prior testimony and police report at the hearing.

4. Although Herrmann's two fellow officers were eyewitnesses to and/or participants in the events at issue, the Government did not call either one to testify at the evidentiary hearing.

this was the marijuana cigarette he had seen earlier, though he acknowledges that he was "quite a distance away" and was unable to discern any properties of the object. *Id.* at 46:17. At the parole hearing, however, Herrmann explicitly testified that he did not see Goines carrying anything, *see* Parole Hr'g Tr. at 23:19, and despite recounting Goines's arrest in detail, never mentioned having seen Goines flick an object to the ground. Furthermore, in the arrest report which Herrmann filled out the night of Goines's arrest, Herrmann stated that Goines had not been using any drugs. *See* Ex. 3500–PH–6 at 1. Goines, for his part, testified that he did not toss or flick an object at any point.

Herrmann identified himself and asked Goines for identification. In response, Goines handed Herrmann his New York non-driver's ID card.[5] Herrmann asked Goines where he lived; Goines responded "right here," referring to 1008 St. Marks Avenue, and told Herrmann that he "had to get inside." Evid. Hr'g Tr. at 20:10.[6] According to Herrmann, Goines then turned and tried to walk toward the housing complex, leaving Herrmann holding his ID card. Goines, on the other hand, testified that Herrmann gave him back his ID card and that he placed it in his outside jacket pocket. Herrmann claims that he then "stuck out [his] right arm[and] put [his] hand on [Goines's] chest to stop him[,]" *id.* at 20:16, and said, "hold up, we're not done yet." *Id.* at 72:25. As Goines describes it, Herrmann actually "grabbed" his jacket and held on to it, then attempted to search his jacket pocket with his other hand. *Id.* at 116:17.

Herrmann claims that Goines then "swung [his hand] toward [Herrmann's] face," that Herrmann "put [his left] hand out to try and stop [Goines]," and that the two men's hands both "hit [Herrmann's] face and [his] glasses fell off." *Id.* at 20:19–21. At the parole hearing, Herrmann testified that Goines "pushed [Herrmann's] arm away and threw his arms up toward [Herrmann] as if to get away from [him]," causing Herrmann's glasses to fall off in the process. Parole Hr'g Tr. at 12:20–21, 27:12–14. By comparison, in the state-court criminal complaint, Herrmann alleged that Goines "punch[ed him] in the face ... knocking [his] glasses to the ground." Ex. 3500–PH–3 at 1. Goines, for his part, testified that he merely "pulled away ... to get out of [Herrmann's] grasp," Evid. Hr'g Tr. at 116:25, and did not swing at or punch Herrmann. In any event, Herrmann suffered no injury other than "redness" on his face, Evid. Hr'g Tr. at 21:12–13; at the parole hearing, Herrmann did not even mention this "redness" and testified that, other than having his glasses knocked off, he was not "hurt or injured in any way." Parole Hr'g Tr. at 27:15–20. At the parole hearing, but not at the evidentiary hearing, Herrmann testified that he then "pushed [Goines] back." *Id.* at 27:22.

Herrmann claims that Goines then "started running away" and was tackled by one of Herrmann's fellow officers. Evid. Hr'g Tr. at 21:11. At the parole hearing, Herrmann did not testify that Goines tried to run away; rather, he testified that Goines had stumbled backwards after being pushed by Herrmann, and that another officer tackled Goines "as he was falling

5. New York issues a non-driver's ID to individuals who do not have driver's licenses or whose licenses have been suspended or revoked. *See* New York State Dep't of Motor Vehicles–Driver License, Learner Permit and Non–Driver Photo ID Card, http://www. nysdmv.com/license.htm# nondriver (last visited Mar. 30, 2009).

6. Goines testified that he was in a hurry to get inside because he had a 9:00 curfew as a condition of his parole.

backwards" from Herrmann's push. Parole Hr'g Tr. at 12:21–23, 27:22–25. When questioned at the evidentiary hearing about the inconsistency between his present claim that Goines had attempted to run away and his earlier statement, Herrmann acknowledged that the incident "happened so fast [Goines] really didn't get a chance to [attempt to get away] because [Herrmann's fellow officer] tackled him." Evid. Hr'g Tr. at 72:13–14. Goines denies trying to run and claims that he merely attempted to walk away, and that after he had taken only "a step[or] a step and a half" toward the apartment complex, the officer tackled him from behind. Id. at 150:8

The three officers then attempted to handcuff Goines. According to Herrmann, at first, Goines merely "[held] his hands under [his body] … [and] just tr[ied] to move around and not be handcuffed." Id. at 23:2–3; see also id. at 22:20–21 (stating that Goines "held both [his] fists up to [his] chest … with [his] elbows in" and resisted the three officers' attempts to pull his hands behind his back). Goines acknowledged that he initially "locked [his] limbs" beneath him because he did not want to be handcuffed. Id. at 118:11. Herrmann now claims that during this time, Goines repeated the phrase, "It was just weed. That's all it is." Id. at 23:16. Herrmann has not previously testified that Goines made this remark (or that Goines had otherwise acknowledged possessing or using marijuana). Goines denies making this statement.

At some point, Goines said "all right; I give up," and the officers allowed Goines to stand. Id. at 23:4. Goines testified that he then submitted to the officers and was immediately handcuffed. According to Herrmann, however, Goines then proceeded to "f[a]ll backwards … over [a] guardrail," taking one of Herrmann's fellow officers with him, and began to punch and kick, struggling violently and defying the

three officers' attempts to subdue him for ten to fifteen minutes, id. at 23:6–7; Herrmann specified that it was only once Goines claimed to submit and was allowed to stand up that Goines "actually [began to] swing his fists and kick." Id. at 23:9–11. Goines denies punching or kicking any of the officers at any point and denies falling over the guardrail. Herrmann's testimony at the parole hearing does not reflect this fall over the guardrail or any punching and kicking on Goines's part—merely Goines's attempt not to be handcuffed. See Parole Hr'g Tr. at 28:14–29:2 ("Q: What do you mean 'fought with [Goines?]'? A: He didn't want to be handcuffed so we had to use physical force.' "). Herrmann's contemporaneous police report states that no force was used during the arrest. See Ex. 3500–PH–6 at 2.

After Goines was handcuffed, Herrmann began searching Goines and asked him why he had resisted arrest. Goines told Herrmann that he had a broken gun in the interior pocket of the jacket he was wearing. Herrmann then searched the pocket and recovered an inoperable .380 semiautomatic pistol loaded with four live bullets. The small gun was not visible or palpable through the heavy, puffy jacket.

Herrmann claims he then searched the scene for the object he had purportedly seen Goines flick to the ground, but found nothing. However, at the parole hearing, when asked what he had done after handcuffing and searching Goines, Herrmann did not mention going back to look for any object. See Parole Hr'g Tr. at 34:9–11. Goines testified that after Herrmann handcuffed him, the officers took him directly to the police station and that Herrmann did not return to the scene to search for anything. The other two young men, whom Herrmann had seen passing the marijuana cigarette, disappeared during

the struggle with Goines and were never found.

It is unclear what became of Goines's ID card, which Herrmann claims Goines did not take back from him. Herrmann never vouchered the ID card at the police station. Herrmann testified at the evidentiary hearing that the ID was still in his hand when the struggle began, and surmises that it must have fallen to the ground during the scuffle with Goines. Before the state grand jury, however, Herrmann testified that he had immediately "put [Goines's ID] in [his] pocket...." State Grand Jury Tr. at 7:2–3. Goines, who claims that he did take back his ID card and that he placed it in *his own* outside jacket pocket, testified that he "lost it during the struggle" along with his house keys and other personal effects which had also been in that pocket. Evid. Hr'g Tr. at 115:8–9.[7] Even though both Herrmann and Goines testified at the evidentiary hearing that the ID card fell to the ground, Herrmann testified that he did not see the ID card on the ground after Goines's arrest while searching for the object which Goines had flicked.

## II

■ The Fourth Amendment's proscription of unreasonable seizures generally prohibits a police officer from seizing an individual absent probable cause to believe that "an offense has been or is being committed by the person to be arrested." *Dunaway v. New York,* 442 U.S. 200, 208 & n. 9, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (citations, internal quotation marks and alterations omitted). In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court carved out a limited exception from this general rule, holding that "an officer may, consistent with the Fourth Amendment, conduct a

brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow,* 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing *Terry,* 392 U.S. at 30, 88 S.Ct. 1868).

■ Whether a particular detention requires probable cause or reasonable suspicion, a court "must look at the 'totality of the circumstances' of [the] case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)). The court must view the circumstances leading up to the seizure "from the standpoint of an objectively reasonable police officer," *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996), and must allow for "commonsense judgments and inferences about human behavior," *Wardlow,* 528 U.S. at 125, 120 S.Ct. 673 (citing *Cortez,* 449 U.S. at 418, 101 S.Ct. 690).

■ On a suppression motion, "[t]he Government bears the burden of proof as to establishing probable cause" or reasonable suspicion, as the case may be. *United States v. Delossantos,* 536 F.3d 155, 158 (2d Cir.2008). The Government must make this showing "by a preponderance of the evidence." *United States v. Matlock,* 415 U.S. 164, 177 n. 14, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

## III

Broadly speaking, the events at issue unfolded in three stages; the Court evaluates them in turn.

---

**7.** Goines's mother testified at the evidentiary hearing that when Goines was released following these events, he had lost his house keys.

## A. Events Preceding the Initial Seizure

 There is no question but that Herrmann could lawfully approach Goines and inquire as to what he was doing. *See Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [and] by putting questions to him if the person is willing to listen. . . ."). However, a Fourth Amendment seizure occurred when Herrmann said "hold up, we're not done yet" and placed his hand on Goines's person— whether he merely "stuck out [his] right arm [and] put [his] hand on [Goines's] chest to stop him[,]" as Herrmann testified, or actually "grabbed" Goines's jacket, as Goines testified. *See California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) ("The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful."); *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) ("Examples of circumstances that might indicate a seizure . . . would [include] the . . . physical touching of the person of the citizen. . . ."); *United States v. Simmons*, 560 F.3d 98, 105–06 (2d Cir.2009) ("A seizure occurs when . . . a person that does not submit to an officer's show of authority is physically restrained."). Therefore, the Court must determine whether Herrmann had probable cause or reasonable suspicion to effect this seizure.

The Government argues that reasonable suspicion existed by this point, because: (1) Herrmann had seen the *other* two young men passing what appeared to be a marijuana cigarette;[8] (2) Herrmann had seen Goines flick or throw an object to the ground as Herrmann approached; and (3) Goines attempted to leave while Herrmann still held Goines's ID card. The Court disagrees.

 First, that Goines was walking behind two other individuals who appeared to be smoking marijuana did not, on its own, justify seizing him. " '[A] person's mere propinquity to others independently suspected of criminal activity' provides neither probable cause to search that person, nor the basis for [a *Terry* stop].' " *United States v. Jaramillo*, 25 F.3d 1146, 1152 (2d Cir.1994) (quoting *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)); *see also id.* ("The sole fact that an individual . . . happens to be in a public place where another person possesses . . . contraband does not provide a basis for a *Terry*-type search if the possessor is a person with whom the searched individual has no known connection."). These two individuals had "no known connection" to Goines. Herrmann observed Goines walking in a public parking lot in the middle of a populous housing project, not side-by-side with the other two individuals, but separate from and behind them. Their suspicious conduct was simply not attributable to Goines under the Fourth Amendment, which, outside of extraordinary circumstances, requires "individualized suspicion of wrongdoing." *City of Indianapolis v. Edmond*, 531 U.S. 32, 37, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000).

If Herrmann had seen Goines flicking what appeared to be a marijuana cigarette to the ground, this, in combination with the foregoing, could well have given rise to reasonable suspicion. However, in light of the conflicting evidence, the Court cannot

---

**8.** The Government does not rely on Herrmann's prior testimony, abandoned at the suppression hearing, that Herrmann observed Goines *himself* passing and/or smoking the marijuana cigarette.

credit that Herrmann made such an observation. The object was never found. In Herrmann's contemporaneous arrest report, he indicated that Goines had not been using any drugs. At the parole hearing, Herrmann described the encounter in detail but made no mention of either seeing Goines flick an object or of returning to the scene to search for it. Herrmann testified inconsistently before the Court both that the allegedly flicked object was "cupped" in Goines's hand and that Goines was holding it "in his two fingers." And, of course, Goines denies flicking or throwing anything.[9]

Similarly, while it certainly could have added to Herrmann's suspicion if Goines had hurried away without recovering his ID card, the Court cannot credit this aspect of Herrmann's testimony. The Government could not explain what happened to the ID. Herrmann's testimony before the Court that the ID was still in his hand when the struggle began, and that he then dropped it on the ground, conflicts with his earlier testimony that he pocketed the ID (and with Goines's testimony that Herrmann returned the ID). Furthermore, this aspect of Herrmann's testimony is difficult to reconcile with his testimony that he closely examined the ground where the incident occurred but did not see the dropped ID card.

Consequently, the Court concludes that the Government has not met its burden of showing reasonable suspicion—let alone probable cause—at the time Herrmann first seized Goines by laying hands on him and telling him to "hold up."

9. Furthermore, even if the Court were to credit Herrmann's testimony that he saw Goines flick *something*, Herrmann conceded that he was too far away to see any properties of the object. Given that Herrmann did not initially see Goines with the marijuana cigarette, and that Goines was walking *behind* the other two individuals (and thus, presumably, had no opportunity to take the marijuana cigarette from them between the time Herrmann first saw them and the time Herrmann approached Goines), the flicking of an utterly indistinct object would not have created grounds for seizure in any event.

### B. Events Between the First and Second Seizures

Even though the Court concludes that the initial seizure violated the Fourth Amendment, this does not conclude the analysis, since the gun was discovered only after Goines had broken away, ending the initial seizure. *See Hodari D.*, 499 U.S. at 625, 111 S.Ct. 1547 ("To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a continuing arrest during the period of fugitivity. If ... Hodari had broken away and had then cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of [the initial] arrest."). Since the gun was found after Goines had been seized a second time, the Court must decide whether this renewed seizure was lawful even though the first was not.

As another court in this district recently explained:

The exclusionary rule addresses the admissibility of evidence *directly* relating to a wrong perpetrated by an investigating officer. As a result, suppression is not warranted where the connection between the discovery of the evidence and the conduct of the police has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 84 L.Ed. 307 (1939). An intervening act of defendant's free will can serve to "purge the primary taint of unlawful invasion" and allow admission of the evidence. *Wong Sun [v.*

*United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)].... *United States v. Bellamy*, 592 F.Supp.2d 308, 321 (E.D.N.Y.2009) (emphasis added). In particular, the taint of the initial wrongful seizure may be purged where "a defendant's [conduct in] response to ... an invalid arrest or *Terry* stop ... constitute[s] independent grounds for [seizure]." *United States v. Dawdy*, 46 F.3d 1427, 1430–31 (8th Cir.1995).

For example, in *United States v. Williams*, 608 F.Supp.2d 325, 329–30, 2008 WL 4642382, at *4–*5 (E.D.N.Y.2008), this Court recently denied a suppression motion where the defendant had wrested himself free from a possibly unlawful seizure, only to be seized again; as is the case here, the gun which the defendant had sought to suppress had been discovered during the second seizure. *See id.* at 330, 2008 WL 4642382, at *5. In *Williams*, the Court held that the defendant's "headlong flight" after breaking free had independently given rise to reasonable suspicion, *see id.* at 329, 2008 WL 4642382, at *4 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) ("Headlong flight ... is certainly suggestive of [wrongdoing.]")), and that the subsequent seizure was thus free of any taint from the initial seizure. *Id.* at 330, 2008 WL 4642382, at *5; *accord United States v. Nooks*, 446 F.2d 1283, 1288 (5th Cir. 1971) (holding that, because of the defendant's attempt to flee, "[t]he nexus ... [with the] original arrest had been attenuated" and the seized evidence could not "realistically be treated as fruits of [the] original arrest.").

■ Here, by contrast, the Government has not shown by a preponderance of the evidence that Goines's post-seizure conduct purged the taint of the initial unlawful seizure. The bare fact that Goines tried to leave the scene cannot create reasonable suspicion or probable cause. *See Florida v. Bostick*, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("[R]efusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."); *United States v. Muhammad*, 463 F.3d 115, 123 (2d Cir.2006) ("An individual approached by an officer who has no reasonable suspicion of wrongdoing may ignore the officer and go about his business, and his refusal to cooperate may not form the basis for his detention."); *cf. Simmons*, 560 F.3d at 108 (holding that "non-compliance with [an] order to stop, [in light of *other* suspicious] circumstances, *reinforced* the officers' determination that [the suspect] may have been engaged in criminal activity" (emphasis added)).

The Court does not credit Herrmann's testimony that Goines broke into a run, *cf. Williams*, 608 F.Supp.2d at 329–30, 2008 WL 4642382, at *4–*5; this testimony is contradicted not only by Goines's testimony at the evidentiary hearing, but also by Herrmann's own testimony at the parole hearing and his eventual acknowledgment at the evidentiary hearing that Goines did not have time to run away before he was tackled.

■ Nor does the Court accept the Government's argument that Goines's alleged use of force to resist arrest constituted an independent crime and thus purged the taint of the original seizure. *Cf. Bellamy*, 592 F.Supp.2d at 321–22.[10] The Government points to New York Pe-

---

**10.** While "[t]he Second Circuit has yet to specifically address whether a defendant's unlawful conduct following an unconstitutional stop or seizure by the police permits the admission of evidence discovered subsequent to the de- fendant's unlawful act," *Bellamy*, 592 F.Supp.2d at 321–22, the First, Fourth, Fifth, Eighth, Ninth, Tenth and Eleventh Circuits have all held that it does. *See id.* at 322 (collecting cases).

nal Law § 35.27, which provides that "[a] person may not use physical force to resist an arrest, *whether authorized or unauthorized,* which is being effected ... by a police officer ...." (emphasis added). However, as explained by the court in *People v. Maksymenko,* Penal Law § 35.27 "is not a complete bar to the right of [one wrongfully arrested] to the use of *some* necessary force," 105 Misc.2d 368, 432 N.Y.S.2d 328, 328 (N.Y.City Crim.Ct.1980) (emphasis added); "[t]he purpose of that section is merely to prevent street combat as a means of determining the validity of an arrest." *Id.*; *see also McLaurin v. Falcone,* No. 04–4849–CV, —— Fed.Appx. ——, ——, n. 2, 2007 WL 247728, at *1 n. 2 (2d Cir. Jan. 25, 2007) (same). Thus, the New York Court of Appeals has held that notwithstanding Penal Law § 35.27, a physical response that is "immediate, spontaneous, and proportionate to [an] officer's attempt to lay hands" on one unlawfully does not "transform the illegal arrest of defendant into a lawful one." *People v. Felton,* 78 N.Y.2d 1063, 1065, 576 N.Y.S.2d 89, 581 N.E.2d 1344 (1991) (upholding suppression even though defendant had "str[uck] the officer" to break free of unlawful seizure); *see also Maksymenko,* 432 N.Y.S.2d at 328 ("[T]he so-called 'pushing' of the officer by the defendant in trying to regain entry to his vehicle was lawful conduct by the defendant who was being unlawfully detained, and is beyond the purview of section 35.27 of the Penal Law.").

The Court does not credit that Goines "punch[ed]" Herrmann, as Herrmann stated in the state-court criminal complaint, or that Goines swung at Herrmann's face, as Herrmann testified at the evidentiary hearing; rather, the Court credits Herrmann's own testimony at the parole hearing that Goines merely "pushed [Herrmann's] arm away and threw his arms up toward [Herrmann] *as if to get away from [him]*" (emphasis added); this is consistent with Goines's testimony that he simply "pulled away ... to get out of [Herrmann's] grasp." Pushing Herrmann's arm away to break free was "immediate, spontaneous, and proportionate to [Herrmann's] attempt to lay hands" on Goines unlawfully. *Felton,* 78 N.Y.2d at 1065, 576 N.Y.S.2d 89, 581 N.E.2d 1344. It therefore did not fall within the range of conduct to which Penal Law § 35.27 is applicable.[11]

Immediately after he broke away from Herrmann, Goines was tackled by another officer. At that point, although Goines did not immediately submit, he had been seized for the second time. *See Hodari D.,* 499 U.S. at 626, 111 S.Ct. 1547; *Mendenhall,* 446 U.S. at 554, 100 S.Ct. 1870; *Simmons,* 560 F.3d at 105–06. None of his conduct from this point forward can be used to justify the second seizure retroactively. *See id.* at 107–08 ("The grounds for a stop must exist at the time of the seizure."). Thus, the Court concludes that

11. Moreover, Penal Law § 35.27 merely bars the *defense* of justification where a separate, free-standing criminal offense is charged, "and does not create a new substantive crime." *Felton,* 78 N.Y.2d at 1065, 576 N.Y.S.2d 89, 581 N.E.2d 1344. Thus, even if Penal Law § 35.27 *did* apply to Goines's conduct, the Government would have to establish that Goines's response to Herrmann's initial seizure constituted a separate substantive crime, such as assault or resisting arrest. It has not done so. Under New York law, the offense of assault requires both the "intent to cause physical injury to another person" and the "caus[ation of] such injury...." N.Y. Penal Law § 120.00(1). Because the Court finds that Goines's response manifested no intent to injure, and because Herrmann testified that he was not injured, Goines did not commit assault. Nor did Goines commit the offense of resisting arrest; that crime requires that the arrest be *authorized* in the first instance. *See* N.Y. Penal Law § 205.30; *People v. Simms,* 36 A.D.2d 23, 319 N.Y.S.2d 144, 144 (4th Dep't 1971).

the Government has failed to meet its burden of showing that legal grounds existed for the second seizure, during which the gun was found.

## C. Events Following the Second Seizure

 Goines's conduct subsequent to the second wrongful seizure did not purge the taint of that seizure. In Herrmann's own words, after being tackled, Goines "[held] his hands under [his body] ... [and] just tr[ied] to move around and not be handcuffed." This was merely passive refusal to cooperate with an unlawful arrest; it clearly did not constitute the use of "physical force" within the meaning of Penal Law § 35.27, and was thus within Goines's rights under state law. Further, the Court cannot credit Herrmann's testimony that during the struggle, Goines voluntarily uttered the phrase "It was just weed"; Goines denies saying this, Herrmann never mentioned it during his three prior opportunities to testify, and Herrmann's police report indicated that Goines had not been using any drugs.

Nor can the Court credit Herrmann's testimony that, after passively resisting for a while, Goines feigned submission, then tumbled over a guardrail with one of Herrmann's fellow officers and began kicking and punching. Goines testified that once he submitted and stood up, he was promptly handcuffed. Herrmann's testimony at the parole hearing—which referred to Goines's attempt not to be handcuffed but did not mention the tumble over the guardrail or the second, violent period of resistance—supports Goines's version of events. And, tellingly, Herrmann's contemporaneous arrest report states that *no force* was used during the arrest, which is entirely inconsistent with Herrmann's present testimony that there was a violent ten-to-fifteen-minute brawl.

Thus, the Court concludes, in light of the inconsistent aspects of the testimony of the Government's lone witness, that the Government has failed to show that the taint from the unlawful second seizure had been purged by Goines's post-seizure conduct.[12]

## CONCLUSION

For the reasons discussed above, Goines's motion to suppress the gun and ammunition seized from his person in violation of the Fourth Amendment is granted.

**SO ORDERED.**

---

12. The Government does not argue that Goines's statement to Herrmann—made in response to Herrmann's inquiry—that Goines had a broken gun in his jacket pocket was a voluntary act which purged the taint of the unlawful second seizure. Such an argument would fail in any event, as "statements [made] to ... officers ... closely consequent upon" an unlawful seizure are not "sufficiently an act of free will to purge the primary taint of the unlawful [seizure]," at least where, as here, the arrestee was subjected to an intimidating show of force and was merely answering questions put to him by the arresting officer. *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).